# THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 15-021** |
| **WILLIAM O'BRIEN** | **:** | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S SECOND MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i) (ECF 969)

Defendant William O'Brien has filed a second motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) (ECF 969). O'Brien primarily contends that that the Supreme Court's decision in *Ruan v. United States*, 597 U.S. 450 (2022), is a "change in the law" entitling him to relief under the "unusually long sentence" provision of the recently amended USSG § 1B1.13(b)(6*)*. O'Brien also claims, as he did in his first motion for compassionate release, that he receives inadequate medical care from the Bureau of Prisons to treat vitamin deficiencies and that he should be released to care for his mother because she is 83 and lives alone. O'Brien's motion should be denied.

## I. Background.

### A. O'Brien's Criminal Conduct.

O'Brien's crimes were extensive and serious. He was convicted of engaging in two drug trafficking conspiracies; and also convicted of 118 counts of illegally distributing controlled substances, conspiracy to commit money laundering, and

bankruptcy fraud and related false statements. Following is an overview of the crimes for which O'Brien is serving a 30-year sentence.

### 1. Drug Conspiracies.

From March 2012 through January 2015, O'Brien, who was an osteopathic physician, used his medical practices as a front for drug trafficking. In exchange for cash, pseudo-patients bought prescriptions from O'Brien primarily for oxycodone and methadone, highly addictive Schedule II opioid-based controlled substances, and alprazolam ("Xanax"), a Schedule IV controlled substance. These drugs were in demand by street dealers who sold the pills for profit.

With the assistance of his receptionist, who facilitated the drug sales by collecting cash, scheduling appointments, and screening new pseudo-patients, O'Brien sold prescriptions for these dangerous controlled substances to approximately 40 pseudo-patients per day. Two of the pseudo-patients to whom O'Brien sold prescriptions were working undercover for the FBI – a civilian witness ("CW") and a federal agent ("agent"). Between January 2014 and December 2014, the CW and agent had multiple appointments with O'Brien. At each appointment, the CW and agent obtained medically unnecessary prescriptions from O'Brien for oxycodone and Xanax in exchange for $250 cash at the first visit, and $200 for each visit thereafter. O'Brien prescribed the controlled substances without any physical examination or diagnosis, or following other standards required for the legitimate prescription of controlled substances in the course of

professional practice. The CW and agent recorded each encounter with O'Brien on audio and videotape.

The agent, who posed as the CW's niece, accompanied the CW to her appointment on August 7, 2014. The agent had not yet met O'Brien and she did not have a scheduled appointment that day. At the CW's request, O'Brien agreed to give the agent a "walk in" appointment. After paying $250 cash, and completing a basic intake form, the receptionist escorted the agent to an examination room where she met with O'Brien. To gauge how many pills she was looking for, O'Brien asked "if you had a big bowl of oxys, how many would you take in a day?" The agent obtained a prescription from O'Brien for 120 oxycodone 30 mg pills without any legitimate medical purpose. On October 2, 2014, O'Brien offered the agent a prescription for Xanax in exchange for oral sex. At the prior appointment, O'Brien gave the agent prescriptions for 120 oxycodone 30 mg pills and 60 Xanax .5 mg pills, commonly referred to among pill abusers as "the peach." Likewise, "the blue" referred to the stronger 1 mg formulation of Xanax. O'Brien offered to trade the agent the "blue for a blow."

O'Brien also traded sex for prescriptions with drug addicted "dancers" at strip clubs. Kathleen Reeves testified at trial that she learned about O'Brien from a patron of the strip club where she worked. Reeves, who was addicted to opioid pills, performed oral sex on O'Brien in exchange for oxycodone prescriptions. Although she could pay the $200 cash fee, O'Brien would only fill Reeves's prescriptions in exchange for sex. Like Reeves, Deanna Lane, a heroin and opioid pill addict, worked as a "dancer" to support

her drug habit. Lane testified at trial that she crushed the oxycodone O'Brien prescribed and injected the substance into a vein in her arm. Also like Reeves, O'Brien required Lane to perform oral sex to obtain opioid prescriptions, including when she was six months pregnant. Lane's child was born premature and addicted to opioids.

In a separately charged conspiracy, O'Brien supplied prescriptions for controlled substances to members of the POMC, a Pagans motorcycle club, known for drug trafficking and violence. POMC members and their associates recruited pseudo-patients to buy prescriptions from O'Brien, primarily for oxycodone 30 mg pills, in exchange for approximately $200 cash. After "cashing" the prescriptions, which was a euphemism for filling a prescription at a pharmacy, the recruited pseudo-patient would give the pills to Pagans or their designees. The Pagans sold the pills wholesale to street dealers.

As the conspiracy matured, Pagans and their associates purchased prescriptions from O'Brien without pseudo-patients being present in his office. The coconspirators gave O'Brien a list of names for whom they wanted prescriptions for oxycodone. O'Brien wrote prescriptions for the drugs as requested in exchange for $200 cash per "patient."

The so-called medical charts for POMC members were devoid of legitimate documentation. For example, the chart for coconspirator Patrick Treacy, a 50-year-old Pagans enforcer, who routinely obtained prescriptions for large quantities of oxycodone and methadone from O'Brien, showed he reported on his intake form that he was menstruating, and that he recently had a PAP test. The patient charts were also used as a

way to monitor the coconspirators' activity. Pseudo-patient charts stated the name of the Pagans member or associate who recruited him.

To cement the relationship with O'Brien, POMC members committed acts of violence on his behalf. During an exchange with O'Brien recorded by a former patient on December 18, 2012, in O'Brien's office, O'Brien threatened to "hunt you down like a dog and hurt you" if the patient did not pay O'Brien $2,000 the next day. When the patient did not pay, O'Brien sent Patrick Treacy and codefendant Joseph Mehl to collect. On January 17, 2013, Treacy and Mehl went to the patient's residence carrying weapons. Mehl gave the patient O'Brien's business card and demanded payment. The pair left when a neighbor called the police. The next day, the patient and his roommate were found shot to death.

During the conspiracy period, from March 2012 through January 2015, O'Brien illegally prescribed an astonishing quantity of controlled substances, conservatively estimated at approximately 386,264 oxycodone (30 mg) pills; 30,515 oxycodone (15 mg) pills; 165,630 oxycodone (10 mg) pills; 300,582 methadone (10 mg) pills; and 1,520 alprazolam pills. At trial, the government's medical expert testified that he did not find one legitimate oxycodone 30 mg prescription written by O'Brien.

### 2. The Death of Joseph Ennis.

On December 22, 2013, a family member found Joseph Ennis, 38, dead in his apartment. Police called to the scene recovered bottles of pills containing oxycodone, methadone, and cyclobenzaprine, a muscle relaxer, all prescribed by O'Brien. According

to expert testimony at trial, the combination of methadone and oxycodone killed Joseph Ennis.

In January 2011, Ennis sustained a back injury when he was hit by a van while walking along the street. The attorney Ennis hired to represent him in a personal injury lawsuit against the driver referred him to O'Brien for evaluation and treatment. At that time, O'Brien owned and operated a group of family medical practices under the name WJO, Inc. From January 26, 2011, through October 7, 2011, Ennis was treated at WJO by Dr. Pickard. Pickard prescribed physical therapy, and chiropractic care to treat his back injury, and prescribed a limited number of oxycodone 10 mg pills for pain. When O'Brien took over Ennis's care on October 18, 2011, he dramatically increased the number of oxycodone 10 mg pills from 30 to 100, without explanation.

In July 2012, O'Brien was terminated from WJO, and opened a solo practice called Dr. Bill O'Brien, LLC. By September 2012, Ennis had stopped treatment at WJO, and followed O'Brien to his new practice. At Ennis's first visit, for which he paid the customary $200 cash, O'Brien increased his prescription to 150 oxycodone 15 mg pills. Ennis continued to obtain prescriptions from O'Brien for 150 oxycodone 15 mg pills on a monthly basis until January 2013, when O'Brien doubled the dosage to 30 mg. From January 2013 through September 2013, Ennis obtained prescriptions from O'Brien for 120 oxycodone 30 mg pills on a monthly basis.

In April 2013, O'Brien added methadone to the drug regimen and prescribed both 120 oxycodone 30 mg pills, and 120 methadone 10 mg pills. Methadone is three times as

potent as morphine. There was no legitimate medical reason to prescribe methadone along with oxycodone. While on this combination of drugs, Ennis was involved in two more accidents – he drove into a pole and then off the road and into the woods, which indicated that Ennis was suffering from brain toxicity from high levels of oxycodone and methadone prescribed by O'Brien.

In June 2013, O'Brien added another prescription for a six-month supply of the muscle relaxer Flexeril, which is the brand name for cyclobenzaprine. In August 2013, O'Brien discontinued methadone, and prescribed 120 oxycodone 10 mg (Percocet) pills in addition to 120 oxycodone 30 mg pills. In September 2013, O'Brien again increased the prescription each time to 90 oxycodone 15 mg pills, in addition to 120 oxycodone 30 mg pills, for Percocet.

In October and November 2013, Ennis saw O'Brien on a weekly basis and obtained oxycodone 30 mg pills at each visit. In October 2013 and November 2013, O'Brien prescribed Ennis 270 oxycodone 30 mg pills, and 180 oxycodone 30 mg pills, respectively. On December 17, 2013, the last appointment before Ennis's death, O'Brien inexplicably reintroduced methadone and prescribed 120 oxycodone 30 mg pills and 60 methadone 10 mg pills. Five days later, Ennis was discovered dead in his apartment.

Ennis's medical chart contained no justification for O'Brien's prescribing and showed an absence of the minimum standards for record keeping. At least once, O'Brien refused to refill Ennis's prescription for 120 oxycodone 30 mg pills because Ennis did not

have the full $200 cash fee. But, like a typical drug dealer, O'Brien was willing to bargain. O'Brien said "if he only has half, he gets half."

### 3. Money Laundering.

O'Brien married Elizabeth Hibbs on January 20, 2010. Hibbs, a physician assistant, worked part-time at O'Brien's offices beginning around July 2012, around the time O'Brien began selling prescriptions for controlled substances. Hibbs continued working for O'Brien until he was arrested in January 2015.

O'Brien and Hibbs were officially divorced on October 15, 2012, however they continued to live together and otherwise act as husband and wife. Their official divorce facilitated the laundering of drug proceeds through Hibbs's bank accounts and allowed O'Brien to hide assets during bankruptcy proceedings.

O'Brien generated approximately $20,000 per week in illegal cash proceeds from the drug conspiracies. He did not record any cash receipts in the books or accounts of his medical practice or in his personal accounts. At the end of the "work" day, O'Brien transported the cash to a home he shared with Hibbs. To conceal the source of the proceeds, Hibbs deposited some of the cash among five accounts at different banks titled to her and her daughters. In addition, she deposited drug proceeds into safety deposit boxes titled to her and her daughters. O'Brien also diverted drug proceeds to Hibbs to pay down a private mortgage, held by Hibbs' ex-husband, for a vacation home they shared on Long Beach Island, New Jersey.

### 4.     Bankruptcy Fraud.

On November 15, 2010, O'Brien filed for bankruptcy protection for his former company WJO, Inc. under Chapter 11 of the Bankruptcy Code. After filing for bankruptcy, all of WJO's assets, including the company's billings for services rendered and receivables, were property of the bankruptcy estate. Subsequent to the bankruptcy, O'Brien did not have lawful right to any WJO assets.

In addition to its core medical practice, WJO provided contract billing and collection services to Philadelphia Family Medical Associates, Inc. ("PFMA"), a separate and independent medical practice of Dr. Brian Walsh. Several years before the petition was filed, O'Brien had agreed to handle billing and collection services for Walsh's practice. Walsh paid WJO approximately 50% of the amount billed and collected on a weekly basis. O'Brien concealed WJO's business relationship with PFMA from the trustee of the bankruptcy estate.

In January 2011, PFMA was notified that all future remittance checks for WJO's billing and collection services should be made payable to O'Brien's paramour and ex-wife "Elizabeth O'Brien." The billing and collection services for PFMA continued to be performed as before by a WJO employee, who received a salary from WJO for performing billing services. Hibbs, also known as Elizabeth O'Brien, did not perform any of the billing and collection work, yet she collected checks from PFMA and deposited the monies, totaling approximately $256,611, into her personal bank accounts.

O'Brien also diverted payments on WJO receivables from the bankruptcy estate to his personal accounts. O'Brien instructed attorneys and insurance companies who owed WJO money to issue checks made payable to him. From July 11, 2011, through October 2012, when the trustee fired O'Brien and Hibbs from WJO, O'Brien diverted approximately $101,300 from the bankruptcy estate for his personal use.

In connection with the bankruptcy proceedings, and attempting to recover diverted assets, the trustee deposed O'Brien under oath on October 6, 2014. O'Brien testified that he had "nothing. I take no money off of the business." He also claimed that he was living at his Levittown office. In actuality, O'Brien was making about $20,000 in cash each week selling prescriptions for controlled substance, and living extravagantly with Hibbs at an apartment in Philadelphia and at the residence on Long Beach Island.

**B.     Procedural History.**

On July 14, 2015, a grand jury returned a second superseding indictment ("SSI") charging O'Brien with two counts of conspiracy to dispense and distribute controlled substances outside the course of professional practice and without a legitimate medical purpose, in violation of 21 U.S.C. § 846; 117 counts of distribution of Schedule II controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); seven counts of distribution of Schedule IV controlled substances, in violation of 21 U.S.C. § 841(a)(1),(b)(1)(E); one count of distribution of controlled substances resulting in death, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); one count of conspiracy to engage in money laundering, in violation of 18 U.S.C. § 1956; one count of conspiracy to

commit bankruptcy fraud, in violation of 18 U.S.C. § 371; and one count of false oath in

bankruptcy proceedings, in violation 18 U.S.C. § 152.

On May 20, 2016, trial commenced. O'Brien represented himself with stand-by

counsel appointed by the Court. On June 28, 2016, a jury convicted O'Brien of all but

four individual distribution counts.

On July 13, 2016, O'Brien filed a motion for new trial and judgment of acquittal,

which was denied on August 9, 2016.

On October 5, 2016, the Court sentenced O'Brien to 30 years in prison and

ordered forfeiture of approximately $5 million in proceeds traceable to the offenses.

When imposing sentence, the Court noted that O'Brien was a "drug trafficker" who

preyed on addicts and extorted sexual favors, and who threatened customers who owed

money. The Court further acknowledged the "hundreds of thousands of illegal pills he

prescribed, the hundreds of thousands of dollars he diverted, the lies he spoke, the

humiliation he imposed on women addicted when he required oral sex for prescriptions,"

and the harm to the medical profession and to the community at large.

O'Brien timely appealed his conviction, contending that the district court erred by

failing to appoint counsel to represent him at the hearing on his request to proceed *pro se*;

that the Court improperly limited his cross-examination; and that the Court erred when it

instructed the jury on Count 124 charging the distribution of a controlled substance

resulting in death. On June 19, 2018, the Third Circuit affirmed. *United States v. O'Brien*,

738 F. App'x 38 (3d Cir. 2018). On July 12, 2018, O'Brien's petition for panel and *en*

*banc* rehearing was denied. On December 8, 2018, the Supreme Court denied O'Brien's petition for a writ of certiorari.

On April 26, 2019, O'Brien filed a timely Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255, raising approximately 27 claims. (ECF 866.) The petition was denied on January 28, 2020, with no certificate of appealability issued. (ECF 882.) On February 10, 2020, O'Brien filed a notice of appeal which was denied by the Court of Appeals on July 21, 2020 (ECF 884, 897).

On August 30, 2022, O'Brien filed a Motion for Relief from a Judgment or Order Under Rule 60(b), contending that the jury instructions in his case were improper under the Supreme Court's decision in *Ruan,* and therefore that his drug convictions must be vacated. (ECF 936.) The government filed a response (ECR 940), first explaining that O'Brien's motion was effectively a second or successive motion under 28 U.S.C. 2255, which may not be filed without the express permission of the Court of Appeals – which O'Brien had not, and could not, obtain. *Id.,* p. 11. The government then addressed the merits of O'Brien's claim under *Ruan,* demonstrating that the Court instructed the jury precisely as *Ruan* now requires. *Id.,* pp. 11-14. On February 19, 2023, this Court issued an order denying O'Brien's Rule 60(b) motion, finding that it must be treated as a second or successive Section 2255 motion, for which O'Brien had not sought authorization from the Third Circuit (ECF 955). O'Brien appealed to the Third Circuit (ECF 956). On July 13, 2023, the Third Circuit denied a certificate of appealability (ECF 966).

On November 10, 2022, O'Brien filed his first motion for compassionate release (ECF 939), discussed below, which this Court denied on March 21, 2023 (ECF 959).

On October 26, 2023, O'Brien filed a Petition for Audita Querela and Petition for Habeas Corpus (dated October 18, 2023), again raising his *Ruan* claim. This was docketed on a civil docket, 23-cv-4206, as ECF 1, but was not docketed on the instant criminal docket. On November 6, 2023, this Court issued a memorandum opinion (ECF 3 on 23-cv-4206), denying his petitions (ECF 1). Meanwhile, however, on November 13, 2023, O'Brien had resent his Petition for Audita Querela and Petition for Habeas Corpus, which were then docketed at ECF 970 on the instant criminal docket, 15-cr-0021, and per that docket, remain pending as of this writing. (The only difference between ECF 1 on the civil docket and ECF 970 on the criminal docket appears to be that on page 1 of ECF 970, which is dated October 18, 2023, O'Brien wrote "Resent 11/13/23.") Contemporaneously with this filing, the government is requesting that the Court deny on the criminal docket as well the audita querela motion.

On November 13, 2023, O'Brien filed the instant Second Motion for Compassionate Release (ECF 969). The government files this response.

### C.    O'Brien's Custody Status

O'Brien is serving his sentence at FCI Hazelton, with a minimum release date of September 4, 2040. He has served approximately nine years (108 months) and has credit for good conduct time of approximately 14 months, for total time served of approximately 122 months of the 360-month term. He has committed three disciplinary

infractions – in 2016 (failing to follow safety regulations), 2018 (refusing an order), and 2021 (possessing an unauthorized item).

## II.    O'Brien's First Request for Compassionate Release.

On October 4, 2022, O'Brien submitted a request for compassionate release to the warden. His request was on two grounds: 1) that in recent months he had not been receiving his prescribed multi-vitamins for vitamin deficiencies resulting from his 2007 bariatric surgery; and 2) his mother, 82, lives alone. Def. Mtn. p. 7. It appears that the warden did not respond to the request. On November 10, 2022, O'Brien then filed a motion in this Court for compassionate release. (ECF 939.) He presented three grounds: (1) he was not receiving the multi-vitamins; (2) his elderly mother lives alone; and (3) he anticipated success in his then-pending Motion for Relief From a Judgment or Order Under Rule 60(b) (ECF 936) (in which he contended that the Supreme Court's decision in *Ruan* mandated an arrest of judgment or new trial), and he also anticipated success in a Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. 2255 that he anticipated filing, alleging *Brady* violations. O'Brien contended that the Supreme Court's ruling in *Concepcion v. United States,* 142 S. Ct. 2389 (2022), constituted an intervening change of law which allowed this Court to consider the merits of his Rule 60(b) motion.

On March 21, 2023, this Court denied O'Brien's Motion for Compassionate Release (ECF 959).

### III.    O'Brien's Second (Instant) Motion for Compassionate Release

O'Brien again seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, because he does not present an "extraordinary and compelling reason" allowing consideration under the statute for this exceptional remedy, and in any event, release is not warranted upon consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a).

### A.    O'Brien's Legal Challenge to the Lawfulness of His Conviction Is Not Cognizable Under the Compassionate Release Statute.

O'Brien's principal argument for compassionate release is that the Supreme Court's decision in *Ruan v. United States*, 597 US 450 (2022), is a "change in the law" entitling him to relief under the "unusually long sentence" provision of the recently amended USSG § 1B1.13(b)(6*).* This claim is meritless.

Section 1B1.13(b)(6), as amended effective November 1, 2023, recognizes as "extraordinary and compelling" a situation in which the defendant has served more than 10 years in custody, he is serving an "unusually long sentence," and due to a "change in law" (other than a nonretroactive change to the Sentencing Guidelines) there is "a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed. . . ." The government asserts that this provision is not legally valid, as it exceeds the Sentencing Commission's statutory authority, in that a change in sentencing law is not an "extraordinary" circumstance allowing relief under the compassionate release statute. *See United States v. Carter*, -- F. Supp. 3d --, 2024 WL 136777 (E.D. Pa. Jan. 12, 2024) (Beetlestone, J.) (lengthy opinion agreeing with the

- 15 -

government's view). But the issue need not be resolved here, as this new provision is plainly inapplicable in this case.

O'Brien is not asserting that there has been a change in law that would produce a different sentence. He is asserting that under a change in law he is not guilty of crimes of conviction. It is well settled that Section 3582(c)(1)(A) does not authorize relief based on a legal challenge to a defendant's conviction, thus supplanting the functions served by a direct appeal or petition for habeas relief (and their attendant limitations).[1] As Judge Easterbrook summarized, and appellate courts have unanimously concluded:

> In other words, the sort of "extraordinary and compelling" circumstance that § 3582(c)(1) addresses is some new fact about an inmate's health or family status, or an equivalent post-conviction development, not a purely legal contention for which statutes specify other avenues of relief—avenues with distinct requirements, such as the time limits in § 2255(f) or the need for a declaration by the Sentencing Commission that a revision to a Guideline applies retroactively.

*United States v. Von Vader*, 58 F.4th 369, 371 (7th Cir. 2023). *See also United States v. Andrews*, 12 F.4th 255, 260 (3d Cir. 2021) (a nonretroactive change in sentencing law does not provide a basis for compassionate release, as the imposition of a sentence that comported with existing law, and later nonretroactive changes to that law, do not present extraordinary situations); *United States v. Henderson*, 858 F. App'x 466, 469 & n.2 (3d

---

[1] The newly amended guideline is consistent. After providing that a change in sentencing law allows relief in limited circumstances, the guideline states: "Except as provided in subsection (b)(6), a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement." § 1B1.13(c). That provision is consistent with the rule explained above that the compassionate release statute may not be employed to state a legal challenge to a conviction.

- 16 -

Cir. 2021) (not precedential) (a previously rejected claim of sentencing error does not qualify as an "extraordinary and compelling reason" for compassionate release, and to the extent that the defendant argues that his sentence should be vacated on this basis, such a claim can be raised only in a § 2255 motion); *United States v. Amato*, 48 F.4th 61, 63 (2d Cir. 2022) ("a district court does not have discretion to consider new evidence proffered for the purpose of attacking the validity of the underlying conviction in its balancing of the 18 U.S.C. § 3553(a) factors. Facts and arguments that purport to undermine the validity of a federal conviction must be brought on direct appeal or pursuant to 28 U.S.C. § 2255 or § 2241."); *United States v. Escajeda*, 58 F.4th 184, 187 (5th Cir. 2023) (claims of ineffective assistance of counsel, and that the sentence exceeded the statutory maximum, are not cognizable in a compassionate release motion; the court "hold[s] that a prisoner cannot use § 3582(c) to challenge the legality or the duration of his sentence; such arguments can, and hence must, be raised under Chapter 153 [of Title 28, addressing habeas corpus]."); *United States v. McCall*, 56 F.4th 1048, 1058 (6th Cir. 2022) (en banc) ("we do not read 'extraordinary and compelling' to provide an end run around habeas."); *United States v. Williams*, 62 F.4th 391, 392 (7th Cir. 2023) ("There's nothing 'extraordinary' about a legal error by a district court (or a court of appeals), and the law provides methods other than compassionate release for dealing with claims of legal error."); *United States v. Crandall*, 25 F.4th 582, 586 (8th Cir. 2022) (a defendant "cannot avoid the restrictions of the post-conviction relief statute by resorting to a request for compassionate release instead.") (quoting *United States v. Hunter*, 12 F.4th 555, 567

(6th Cir. 2021)); *United States v. Wesley*, 60 F.4th 1077, 1289 (10th Cir. 2023) ("We hold that an 18 U.S.C. § 3582(c)(1)(A)(i) motion may not be based on claims specifically governed by 28 U.S.C. § 2255"; the court properly excised a claim of prosecutorial misconduct at sentencing as a basis for compassionate release, as it had no jurisdiction to consider the issue in this context); *United States v. Jenkins*, 50 F.4th 1185, 1201 (D.C. Cir. 2022) ("We must therefore interpret the compassionate-release statute in light of this reticulated scheme for collateral review, rather than invoke compassionate release to end-run its limits. Thus, even if procedural hurdles would now prevent Jenkins from raising his sentencing argument in collateral proceedings, we cannot treat such a bar on relief under section 2255 as supporting a finding of extraordinary and compelling circumstances.").[2]

Here, O'Brien challenges the Court's jury instructions, claiming that they are defective under the Supreme Court's decision in *Ruan.* O'Brien has raised this contention multiple times in various motions, e.g., his Motion for Relief from a Judgment or Order Under Rule 60(b) (ECF 936) and his Petition for Writ of Audita Querela and Petition for Writ of Habeas Corpus (ECF 1, 23-cv-4206), and this Court has determined that those filings were second or successive motions pursuant to 28 U.S.C. § 2255. *See* ECF 955, p.

---

[2] Since the amendment to § 1B1.13, courts continue to recognize that a challenge to the underlying conviction or sentence is distinct from a claim based on a change in sentencing law, and may only be brought under 28 U.S.C. § 2255. *See, e.g.*, *United States v. Gross*, 2023 WL 8716878, at *10 (D. Md. Dec. 18, 2023) (Hollander, J.); *United States v. Young*, 2023 WL 8722060, at *5 (W.D. Va. Dec. 18, 2023) (Urbanski, C.J.).

3; ECF 3, p. 3. So, too, here. O'Brien attempts to use the compassionate release statute and the Guidelines Policy Statement to challenge his convictions, effectively pursuing a second or successive Section 2255 motion without having obtained permission from the Court of Appeals. As set forth above, this he cannot do.[3]

## B.   Neither O'Brien's Claim of Inadequate Medical Treatment Nor His Family Circumstances Claim Warrants Compassionate Release.

In his motion, O'Brien additionally summarily contends that this Court should grant him compassionate release because he is receiving inadequate medical care and because his mother needs him to care for her. In total, his argument is as follows:

Petitioner also seeks relief under USSG 1B1.13(b)(3)(C) for his mother:

(C)  The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

See attached affidavit from his mother.

AND

Just as importantly, Petitioner also claims USSG § 1B1.13(b)(1)(C)

(1) MEDICAL CIRCUMSTANCES OF THE DEFENDANT
(C) The defendant is suffering from a medical condition that requires longterm or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

\* \* \*

---

[3]  The government has also explained at length that O'Brien's *Ruan* challenge is completely without merit in any event. *See* ECF 940 at pp. 11-14.

> The medical issues included will be easily addressed and corrected once Petitioner is released. O'Brien's 83-year-old mother, also noted in this petition, needs someone to care for her. This too is an adequate reason for release.

ECF 969, pp. 3, 11. O'Brien provides no additional argument in support of these claims, and instead only attaches an affidavit from his mother, ECF 969, p. 14, and an email trail of his communications with BOP staff concerning his vitamin pills, ECF 969, pp. 23-29. This argument and evidence fail to establish extraordinary and compelling reasons warranting consideration for compassionate release.

As pertinent here, the guideline policy statement provides in Section 1B1.13(b) that "extraordinary and compelling reasons" exist where:

(1)     Medical Circumstances of the Defendant.—

* * *

(C)     The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

* * *

(3)     Family Circumstances of the Defendant.—

* * *

(C)     The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Hampton*, 985 F.3d 530, 533 (6th Cir. 2021); *United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021); *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v.*

*Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020) (Kearney, J.). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (citations omitted).[4] O'Brien has failed to meet his burden of establishing any "extraordinary and compelling reason" for compassionate release.

### 1. Medical Care.

As noted above, O'Brien contends that he is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which he is at risk of serious deterioration in health or death. O'Brien does not identify what the condition is, nor does he state what medical care he is not receiving; however, he does attach emails between himself and BOP staff, dated September 2, 2022, through June 7, 2023, in which he repeatedly complains that his evening "snack bag," which includes chewable multi-vitamins, has been stopped, or that the prescription for his vitamins was refilled, but he has not received the vitamins.[5] Additionally, in one email

---

[4] The statute provides that rehabilitation alone is not a basis for compassionate release. 28 U.S.C. § 994(t). *See United States v. Claudio*, 2022 WL 1623650, at *3 (E.D. Pa. May 23, 2022) (Kearney, J.) ("[The defendant's rehabilitation does not constitute an extraordinary and compelling reason for release. We commend [him] for his efforts towards rehabilitation. But we are not a parole board reducing sentences simply for good behavior while incarcerated; we must also find extraordinary and compelling reasons for release.").

[5] The emails do not include email addresses (e.g., @ BOP.gov), but are addressed "To" FCI Health Services, CO Friend, and/or "the Pharmacist"; additionally, some are copied to "Warden" or "Warden, Dr. Adams" and PA [Physician's Assistant] Underwood. ECF 969, pp. 23-27.

dated October 4, 2022, he complains that he likewise has not received his "heart medication, seizure medication, blood pressure medication, etc. etc." ECF 969, p. 26.

O'Brien's objections regarding the extent and pace of his medical care are not a proper issue for compassionate release at this time. It is apparent that, at present, he does not present "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(b)(1). Further, O'Brien does not establish that he "is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." § 1B1.13(b)(1)(C).

To the contrary, BOP's medical records show that O'Brien, age 58, is in relatively good health. The medical records for O'Brien's most recent check-up, on August 17, 2023, show that he is being treated for iron, Vitamin D, and B12 deficiencies resulting from gastric bypass surgery in 2007, and that he has hypertension. *See* Govt.'s Ex. A, pp. 5, 6. The notes from an August 1, 2023, Clinical Encounter show that he "stated that he is doing well with his medications and his snack bag." *Id.,* p. 7. Additionally, the records show that on September 25, 2023, Health Services renewed the prescriptions for O'Brien's multivitamins and snack bag. *Id.,* p. 1. Significantly, there has been no change documented by O'Brien or the medical records since O'Brien filed his first motion for

compassionate release on November 10, 2022, in which he complained that he was not receiving his chewable vitamins. As this Court found at that time:

> [O'Brien] has not alleged that he is suffering from a terminal illness or from any condition or impairment that substantially diminishes his ability to provide self-care within the Federal Correctional Institute and from which he is not expected to recover. In addition, according to the Government, and not contested by Defendant, Defendant is fully ambulatory and engages in all normal activities of daily living within the prison. Defendant has not shown that either his alleged vitamin deficiency or purported deprivation of his preferred form of vitamins constitutes the requisite extraordinary or compelling reason for a reduction in his sentence.

Order, ECF 959, page 2.

O'Brien's complaint that he is not receiving the multi-vitamins, whether valid or completely unfounded, is not a ground for release from prison. His objection belongs in the administrative process. There is an established administrative process for an inmate to present complaints, including the option for appeal to higher authorities in BOP. The administrative remedy process is set forth in 28 C.F.R. § 542.10 *et seq*. These BOP regulations provide for an expedited response to administrative requests "determined to be of an emergency nature which threatens the inmate's immediate health or welfare." 28 C.F.R. § 542.18. Under the Prison Litigation Reform Act, an inmate filing a prison-conditions lawsuit must first exhaust all available administrative remedies. 42 U.S.C. § 1997e(a); *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016).

O'Brien has not availed himself of this process to present any complaints about his medical treatment. *See, e.g.*, *United States v. Grant*, 2022 WL 558347, at *5 (E.D. Pa. Feb. 24, 2022) (Sanchez, C.J.) (complaints by pregnant inmate regarding prison

conditions should initially be presented in an administrative forum, and not in a motion for compassionate release); *United States v. Pigford*, 2023 WL 2285825, at *4 (E.D. Pa. Feb. 28, 2023) (Kearney, J.); *United States v. Miller*, 2021 WL 2711728, at *3 (N.D. Cal. July 1, 2021) (Breyer, J.) (explaining that the compassionate release guideline "refers to medical conditions that, by their nature, cannot be treated effectively in prisons. It does not encompass medical conditions that are treatable in prison, even when treatment appears to be inadequate. . . . Mr. Miller has alternative avenues to obtain improved medical care. Prisoners routinely bring constitutional claims based on inadequate medical care. . . . Mr. Miller's argument that inadequate medical care makes him eligible for compassionate release under § 3582(c)(1)(A) . . . suggests that Congress intended that statute to serve as an end-run around this established framework. Not so.").

Indeed, in one of his emails, O'Brien states, "All I want is my medication, but now I want to be released. I await the answer to the BP-9, before I file the BP-10, then the 2241."[6] ECF 969, p. 26. Thus, O'Brien clearly recognizes that he must raise any complaints about his medical care through the administrative process, and that if he is not satisfied with the outcome of those proceedings, he may file a habeas corpus petition pursuant to 28 U.S.C. § 2241.

---

[6] Form BP-9 is a Request for Administrative Remedy, which an inmate may file at the institution where he is serving his sentence. Form BP-10 is a Regional Administrative Remedy Appeal, which an inmate may submit to the BOP regional office. *See* BOP Program Statement, Administrative Remedy Program (dated January 6, 2014), https://www.bop.gov/policy/progstat/1330_018.pdf (retrieved January 12, 2024).

## 2. Family Circumstances.

O'Brien also seeks release based on family circumstances, specifically, that his mother is 83 years old and needs someone to take care of her. ECF 969, p. 12. In the attached Affidavit, O'Brien's mother states that she lives alone and her other two children live in Ohio and New Jersey; that she needs O'Brien at home to help her; and that her medical conditions include hypertension, heart disease, and severe arthritis in her back and shoulder; and that she had brain surgery for "blood on [her] brain," and since then her balance is [no further words in affidavit]. ECF 969, p. 14.

O'Brien's mother's affidavit, even taken at face value, is not sufficient to warrant compassionate release. Section 1B1.13(b)(3)(C) provides that qualifying family circumstances exist where the defendant is the only available caregiver for an incapacitated parent. But O'Brien has failed to establish that his mother is "incapacitated," and he has failed to establish that he is the only available caretaker. *See United States v. Rooks*, 2022 WL 267899, at *6 (E.D. Pa. Jan. 28, 2022) (Kenney, J.) (the defendant fails to show that he is the only available caregiver for his child; to prevail on such a claim, "a defendant typically must establish that all other potential caregivers for their minor child are incapacitated. . . . To prove incapacitation, a defendant must establish a person is 'completely disabled' or unable to 'carry on any self-care and [are] totally confined to a chair or bed.' . . . Moreover, it is not enough to show a potential caregiver is merely 'inconvenienced' by the childcare or 'somewhat sick.'") (citations omitted). *See also, e.g.*, *United States v. Cobb*, 2022 WL 3083034 (E.D. Pa. Aug. 3,

2022) (Kearney, J.) (the defendant fails to show that his mother is entirely incapacitated, or that he is the only available caregiver).

## C.     Consideration of 18 U.S.C. § 3553(a) Factors.

For all of these reasons, O'Brien does not present any "extraordinary and compelling reason" allowing consideration for compassionate release, and his motion should be denied.

We add for purposes of completeness that even if the defendant presented a basis for consideration (which he does not), relief should be denied. This Court must then consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community. *See United States v. Doe*, 833 F. App'x 366 (3d Cir. 2020) (per curiam) (not precedential) (summarily affirming the denial of compassionate release, in a case in which the defendant presented medical risk, upon holding that the district court did not abuse its discretion in considering the nature of the offense, the defendant's history, and the status of the virus at the facility); *United States v. Bullock*, 833 F. App'x 934 (3d Cir. 2021) (per curiam) (not precedential) (granting motion for summary affirmance of denial of compassionate release, as the district court did not abuse its discretion in denying relief for medically vulnerable inmate upon considering the 3553(a) factors, including the substantial time remaining to be served on the sentence and the defendant's criminal history and institutional infractions).

O'Brien does not meet the established criteria for compassionate release. Moreover, he has served only about a third of his 30-year sentence for, among other

crimes, conspiring with members of the Pagans Outlaw Motorcycle Club ("POMC") to traffic opioids. O'Brien's drug trafficking resulted in the death of a young man, Joseph Ennis, whose devasted family made an impassioned plea at his sentencing for accountability and justice. O'Brien's criminality, marked by acts of violence, indicates

that he presents a risk of future dangerousness. The period of time O'Brien has served

thus far is clearly inadequate to address the gravity of the offenses. For these reasons, and

all other considerations under 18 U.S.C. § 3553(a), the defendant's motion should be

denied.

Respectfully yours,

JACQUELINE C. ROMERO
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals


*/s Karen L. Grigsby*
KAREN L. GRIGSBY
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading has been served by first-class mail, postage prepaid, upon:

William O'Brien
Reg. No. 71915-066
FCI Memphis
Federal Correctional Institution
P.O, BOX 34550
Memphis, TN  38184

/s Karen L. Grigsby
KAREN L. GRIGSBY
Assistant United States Attorney

Dated:  January 18, 2024.